# IN THE COURT OF APPEALS OF IOWA

No. 25-0088
Filed June 18, 2025

**IN THE INTEREST OF R.E. and A.E.,**
**Minor Children,**

**Z.E., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Mitchell County, Elizabeth Batey, Judge.


        A father appeals the juvenile court order terminating his parental rights to his two minor children.  **AFFIRMED.**


        Jesse Marzen of The Lawyers, PLLC, Hampton, for appellant father.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

        Danielle M. Ellingson of Noah, Smith, Sloter & Ellingson PLC, Charles City, attorney and guardian ad litem for minor children.


        Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SANDY, Judge.**

A father appeals the juvenile court order terminating his parental rights to his two minor children. The father challenges the statutory grounds for termination and argues termination is not in the children's best interests.

Upon our de novo review of the record, we affirm.

## I. Background Facts and Proceedings

Z.E. is the father of R.E. and A.E. R.E. was born in 2022, and A.E. was born in 2024. The father is married to the children's mother. In June 2023, the family came to the attention of the Iowa Department of Health and Human Services (HHS) after reports were received that the parents' mobile home was in ramshackle condition. According to reports, the parents' mobile home had "human feces and urine in buckets, trash all over the floor, dog feces all over the floor, moldy walls, moldy food, maggots, flies, [and] no running water or an operational toilet." At the time HHS received these reports, the mother was pregnant with A.E. The unsanitary condition of the mobile home ultimately led to the parents being evicted.

After HHS confronted the parents about the unsanitary condition of their mobile home, they voluntarily agreed to place R.E. with his maternal grandparents. Shortly thereafter, the State filed a child-in-need-of-assistance (CINA) petition for R.E. R.E. was adjudicated in need of assistance in September. Initially, the juvenile court placed R.E. in the mother's custody, on the condition that she would reside in the home of the maternal grandparents. But after the mother refused to follow the juvenile court's condition, R.E. was placed in the custody of HHS and placed with maternal grandparents.

A few months after A.E.'s birth in early 2024, HHS received reports alleging that the parents' new apartment the parents was in unsanitary condition. According to reports, the family's landlord checked on the apartment after he received information that the mother and father had traveled out of state and locked their dogs in the apartment's bathroom. As the landlord approached the apartment, "the odor was so bad that he could smell it down the hallway." Upon entering the apartment and opening the bathroom door, the landlord found the bathroom "completely filled" with dog feces and urine. The mother and father were subsequently evicted from this apartment for failure to pay rent.[1]

Following the report about the parents' new apartment, HHS filed for an ex parte temporary removal order for A.E. in March. This was granted by the juvenile court, and A.E. was placed in the temporary custody of HHS. The State then filed a CINA petition for A.E. A.E. was adjudicated in need of assistance in May and placed in the custody of HHS for purposes of placement with relatives. A.E. was also placed with the maternal grandparents.

Beyond the mother and father's inability to provide stable and sanitary housing, there have been concerns about their mental health, a history of domestic abuse in their relationship, and their inability to properly supervise the children

---

[1] Of note, after the mother and father were evicted from their mobile home, they moved to a rental home. However, they were evicted from the rental home in December 2023 "due to owing nearly $4000 in rent and utilities." The mother and father subsequently moved into the apartment. After being evicted from the apartment, the mother and father moved into another rental home. However, they were quickly kicked out of this home over a dispute with their landlord about rent payments. The mother and father then proceeded to live out of a storage unit.

throughout the underlying CINA cases. The father did little to address these issues.

Regarding the father's mental health, the record reveals he has self-reported previous diagnoses of "PTSD, overactive anxiety, ADHD, depression, and borderline bipolar disorder." The father obtained two mental health evaluations—both of which recommended that he participate in individual therapy and receive a medication evaluation—over the course of this case. However, the father never received a medication evaluation. And while at one point the father consistently engaged in individual therapy on a weekly basis, he was unsuccessfully discharged from therapy for missing too many appointments shortly before the termination hearing. The father's therapist reported to HHS that the father "was not taking [therapy] seriously anymore."

As for the history of domestic abuse in the mother and father's relationship, the record discloses that the father has previously been convicted of domestic abuse assault with intent to inflict serious injury for assaulting the mother. The father received probation for this offense, and a no-contact order was in place between the mother and father from September 2021 to March 2022. And Chandler Santee—the HHS case worker assigned to the family—testified at the termination hearing that the mother disclosed to him that the father "was last physical in January when she was pregnant with [A.E.]"

Lastly, HHS has consistently expressed doubt about the mother and father's ability to adequately supervise the children. A month before the termination hearing, the father's six-year old son from a prior relationship came to stay with the

mother and father for a few weeks.[2]  One morning, while the mother and father were sleeping, the father's son  "ingested Ajax cleaner" that was left unsecured in the home.  Instead of immediately taking the child to the emergency room, the father proceeded to call the child's mother and demand that she pay for half of the hospital bill.

While the father's son was staying with the mother and father, they also had one supervised visit with A.E. and R.E.  During this visit, the social worker observed that "there was lighter fluid and hydrogen peroxide within accessibility" of R.E. and A.E. on a television stand.  At one point, the social worker observed A.E. holding herself up with the help of the television stand as it was shaking.  The social worker had to instruct the mother to grab A.E., "as [the mother] and [father] were distracted on their phone[s]."  Of note, the mother and father never progressed beyond supervised visitation with the children.[3]

Due to the mother and father's failure to ameliorate concerns expressed throughout the underlying CINA cases, the State filed petitions to terminate their parental rights to R.E. and A.E.  The juvenile court held a termination hearing in November 2024.  During the hearing, the juvenile court heard testimony from the mother, father, and Santee.  Following the hearing, the juvenile court issued its order terminating the mother's and father's parental rights to the children pursuant to Iowa Code section 232.116(1)(h) (2024).

---

[2] According to the father's testimony at the termination hearing, the mother and father obtained housing through Friends of the Family—a rental assistance organization for homeless individuals and victims of domestic abuse and sexual assault—on September 27, 2024.

[3] The mother and father were court-ordered to obtain a parenting evaluation. However, neither parent ever completed an evaluation.

The father now appeals.[4]

## II. Standard of Review

"The standard of review in termination cases is de novo." *In re J.J.S.*, 628 N.W.2d 25, 28 (Iowa Ct. App. 2001). "Although we are not bound by them, we give weight to the [juvenile] court's findings of fact, especially when considering credibility of witnesses." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). Our primary concern in termination cases is the best interests of the children. *Id.*

## III. Analysis

"We use a three-step analysis to review [the] termination of parental rights." *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "The first step is to determine whether any ground for termination under section 232.116(1) has been established." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). If a statutory ground for termination has been established by clear and convincing evidence, "then we determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id.* at 219–20. Lastly, if we determine the best-interest framework supports termination of parental rights, "we consider whether any exceptions in 232.116(3) apply to preclude termination." *Id.* at 220.

"However, if a parent does not challenge a step in our analysis, we need not address it." *In re J.P.*, No. 19-1633, 2020 WL 110425, at *1 (Iowa Ct. App. Jan. 9, 2020).

---

[4] The mother does not appeal.

*1. Statutory Grounds*

Section 232.116(1)(h) permits the juvenile court to terminate parental rights if it finds all of the following:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The father contests only the fourth element—that the children could not be returned to his custody at the present time. Our supreme court has interpreted "present time" to mean at the time of the termination hearing. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present the time" to mean "at the time of the termination hearing"). We find the father's challenge unpersuasive and conclude the evidence is clear and convincing that the children could not be returned to his custody at the time of the termination hearing.

As an initial matter, the father asserts that the children could have been returned to his custody at the time of the termination hearing because the issue of "unsuitable housing" was "resolved at the date of hearing." True, the mother and father obtained housing a month before the termination hearing. But we are not convinced this assuaged legitimate concerns about their housing stability and suitability. As the juvenile court noted in its thorough ruling, the parents have a "long history of obtaining housing and then failing to maintain that housing." A

parent's past behavior is some of the best evidence available to us in determining what the future will hold for children under a parent's care. *See C.B.*, 611 N.W.2d at 495 ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" (citation omitted)).

And the father's attempts to address the issue of stable and suitable housing came far too late to give us confidence the children could have been returned to his custody on the date of the termination hearing. *See In re D.M.*, No. 21-0882, 2021 WL 4303626, at *5 (Iowa Ct. App. Sept. 22, 2021) (concluding a child could not be returned to the father's custody at the time of the termination hearing because his "very recent efforts" to address housing stability began two years after the child had been removed from his custody).

Further, stable and suitable housing was far from the only concern with the father. There were also concerns about the history of domestic abuse in the mother and father's relationship. It is undisputed that the father has a prior conviction for domestic abuse assault for assaulting the mother. Additionally, Santee testified that the mother disclosed to him that the father "was last physical" with her while she was pregnant with A.E. in January 2024.

In his petition the father attempts to downplay his history of domestic abuse by highlighting he and "his wife testified that domestic abuse was not an issue in their relationship." But the juvenile court noted it found the mother and father's testimony to be lacking in credibility, and we defer to its finding on this issue for pragmatic reasons. *See C.B.*, 611 N.W.2d at 492. Bottom line, we cannot

conclude the children could have been returned to the father's custody when there is little to suggest that he sufficiently addressed concerns about his history of domestic abuse. *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *4 (Iowa Ct. App. Apr. 15, 2020) (concluding a child could not be returned to the father's custody at the time of the termination due to unresolved domestic abuse issues).

The father also did not sufficiently address his mental health. Despite two recommendations to do so, he never received a medication evaluation. And while at one point the father consistently engaged in individual therapy, he was discharged from therapy shortly before the termination hearing for missing too many appointments with his therapist. His therapist reported to HHS—shortly before he was discharged from therapy—that the father was not taking therapy "seriously anymore." This bolsters our conclusion that the children could not be returned to the father's custody. *See In re N.M.*, No. 24-2083, 2025 WL 708520, at *2 (Iowa Ct. App. Mar. 5, 2025) (finding a child could not be returned to the father's custody because the father "continues to have unaddressed" mental-health concerns).

Lastly, we find the father did not sufficiently address issues concerning his ability to safely supervise the children. The father attempts to frame the incident involving his six-year-old son ingesting potentially toxic cleaning product as an "isolated incident." But the record is clear this was not an isolated incident. During a supervised visit, lighter fluid and hydrogen peroxide were within reach of the children on a television stand. During the same visit, A.E. attempted to stand up using the television stand as the television shook. Instead of properly supervising the child, the social worker supervising the visit reported that the father was

distracted and on his phone. This occurred just a month prior to the termination hearing. And despite a court order to do so, the father failed to obtain a parenting evaluation. Thus, concerns over the father's ability to properly supervise the children have not been alleviated. *See In re A.M.*, 843 N.W.2d 100, 111–12 (Iowa 2014) (determining termination under section 232.116(1)(h) was appropriate where the parents could not develop the necessary skills to keep their child safe "without the hovering supervision of [HHS] workers").

For these reasons, we believe the statutory ground for termination was established by clear and convincing evidence.

*2. Best Interests*

Because we have determined that the statutory ground for termination has been established, we consider whether termination is in the children's best interests. In considering a child's best interests, we are to give "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The defining elements of the best-interests analysis are the child's safety and the need for a permanent home. *In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially).

In his petition, the father argues termination is not in the children's best interests due to their close bond with him. As he puts it, "[i]t is not in the children's best interests for the bond between [him] and the children to be destroyed." However, we conclude termination is in the children's best interests.

While we may consider the closeness of the parent-child bond as part of our best-interest framework, *see In re N.A.*, No. 24-1546, 2025 WL 855823, at *5 (Iowa Ct. App. Mar. 19, 2025), this does not prevent us from determining that termination is in the children's best interests. First, we are skeptical that a close bond exists between the children and the father. The children have lived with their maternal grandparents for most of their lives. Additionally, HHS submitted a pre-termination hearing report which noted that R.E. is "unsure of who to call mom and dad." The report adds that "[R.E.] will call any female mom and will call males dad." Given this evidence, we cannot conclude a close bond exists between R.E. and the father. And due to A.E.'s age, we also doubt she has a close bond with the father.

Second, we believe termination will allow the children to achieve much needed permanency. As mentioned above, the children have lived with their maternal grandparents for most of their lives. By all accounts, they have provided the children with a loving, caring, and stable home. The children are thriving under their care. Additionally, the children are bonded with them, and the maternal grandparents have obtained a foster care license and consistently expressed a desire to adopt the children. We cannot deny the children permanency based on a hope that the father will someday take an interest in being a responsible parent. *See A.M.*, 843 N.W.2d at 112 ("[W]e cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." (citation omitted)).

Accordingly, we conclude termination is in the children's best interests.

**IV. Conclusion**

In sum, we affirm the juvenile court order terminating the father's parental rights.

**AFFIRMED.**